THE STATE COUNCIL OF THE JUNIOR ORDER OF UNITED
AMERICAN MECHANICS OF NEW JERSEY

*v.*

THE NATIONAL COUNCIL OF THE JUNIOR ORDER OF UNITED
AMERICAN MECHANICS OF NORTH AMERICA et al.

[Submitted April 18th, 1906. Decided August 1st, 1906.]

1. The constitution of a beneficial association, section 2, specified its objects and declared that they should not be altered unless proposed in writing at a previous stated meeting, and a copy of the alteration transmitted to each member of the body, and if adopted the alteration should be submitted to the members of the order for a vote, and if approved by a majority, should become a part of the constitution. A subsequent article also declared that any alteration or amendment of the constitution must be presented in writing, signed by at least two members from different states, when it should require two-thirds of the members present to adopt it, and that it should then become part of the constitution unless it should be an amendment of article 2, which could only be altered or amended as provided therein.—*Held,* that while the provisions of the constitution other than the declaration of objects should be changed by a two-thirds vote of the members of the national council, the objects of the order could not be changed without a vote of the original constituent members.

2. Where the constitution of a beneficial association, both state and national, provided that one of its objects was to establish "a sick and funeral fund," and that such objects could not be changed except by a vote of the constituent members of the order, and the national council attempted to enforce an amendment providing for the creation of "an insurance branch and a sick and funeral fund," without submitting such amendment to the members of the order, such amendment constituted a material change which justified the withdrawal of a state council from affiliation.

3. Where the state council of a beneficial association was incorporated in New Jersey prior to the organization and incorporation of a national council composed of delegates chosen from the various state councils, the affiliation between the state and national council being purely voluntary, on the termination of such affiliation the state council was entitled to the sole use of its corporate name, and to restrain the national council from operating within the state under such name for the purpose of destroying the state council and various subordinate bodies.

4. Where a state council of a beneficial association after incorporation

28

withdrew from voluntary affiliation with the national council, from whom it had accepted a charter, such withdrawal did not operate to dissolve the state council and prevent it from conducting its business as it had previously done.

5. Where complainant was incorporated under the name "Junior Order of United American Mechanics of the State of New Jersey," the fact ·that such society affiliated with a national council, and that the name "Junior Order of United American Mechanics" was used generally to describe the various councils of the order, did not make complainant's name a general descriptive name so as to deprive it of the exclusive right to use the same in New Jersey.

On final hearing on bill, answer and proofs.

For previous litigation in this state between the parties, see *National Council of Jr. O. U. A. M.* v. *State Council of Jr. O. U. A. M., 64 N. J. Eq. (19 Dick.) 470; S. C. on appeal, 66 N. J. Eq. (21 Dick.) 429.*

*Mr. Fergus A. Dennis* and *Mr. Alan H. Strong,* for the complainant.

*Mr. Charles H. Knox* and *Mr. John T. Dooling* (of New York) and *Mr. Barton B. Hutchinson,* for the defendants.

PITNEY, V. C.

The questions presented for consideration and decision are of great importance to the parties and somewhat novel in character and not easy of solution. They have been argued with marked ability and complete thoroughness by counsel on each side, both orally and in writing, and have received careful consideration.

I say they are important to the parties, because they involve the very life and right to exist on the part of the complainant.

It was, indeed, at first suggested by the defendant that the defeat of the complainant on the merits in this cause did not necessarily involve such radical results, but later on that position was abandoned, and it was distinctly avowed by the de-·fendant that if it succeeded in this cause on the merits it was its intention to proceed by certain measures which it had in view

to practically destroy the complainant's present position and activities.

The complainant seeks by its bill to enjoin the defendant from proceeding with certain measures which it has instituted with a view to establishing an organization in New Jersey with precisely the same name and of precisely the same character as that of the complainant, which new organization shall act in obedience to and in concert with the defendant, and shall take the place which the complainant has heretofore occupied and still occupies in this state, and perform all the functions which the complainant has been, and still is, performing therein.

The defendant avows this intention and that its object is to virtually destroy the complainant.

The reason it gives for this action is that the complainant was for many years, and still ought to be, subject to the jurisdiction of the defendant, and obedient to its laws, and that in the years 1899 and 1900 it rebelled and seceded from the defendant and was disciplined therefor by the defendant, and its charter, granted by defendant and involving its right to exist, was revoked by the defendant.

This rebellious conduct on the part of the complainant is admitted and justified by it, and the validity of this justification is one of the important questions, if not the only question, in the cause and will be first dealt with.

The relations between the parties, in the aspect of the law, was dealt with to some extent in the opinion of this court in *National Council of Jr. O. U. A. M.* v. *State Council of Jr. O. U. A. M., 64 N. J. Eq. (19 Dick.) 470.*

The matter therein in dispute was the imposition of a tax by the defendant on the complainant, and upon that question this language was used: "In considering this question it must be borne in mind that the relation between the parties is a purely voluntary one. The constitution of the national council provides for the collection of a tax in the manner hereinbefore stated; but it is hardly necessary to remark that it has no power to enforce it. So with the state council; it imposes a tax upon the different subordinate councils, but has no power to enforce it. Neither have the officers of the subordinate councils any

power to enforce a tax which they lay upon their members. Any member may withdraw at any time. The adhesive power which holds these several bodies together is the supposed benefit, first, to the individual members by reason of their membership; then to the subordinate council by reason of its connection with the state council, and then to the state council by reason of the benefit supposed to be derived by its connection with the national council. The relation, indeed, between them is *quasi* contractual; but I can find no warrant anywhere in the case, nor in the law applicable thereto, for the notion that the national council could bring an action at law against any state council and recover damages for its refusal to collect any tax which the national council may impose. Whatever right of that sort exists is unenforceable by legal action, and hence the complainant was compelled to put its case upon the ground of a trust, for money had and received."

As the decree made by this court was affirmed in *66 N. J. Eq.* (*21 Dick.*) *429*, for the reasons given by this court, I shall assume that, so far as that language is applicable here, it is correct. And it may be summarized for present purposes thus— the relations between the parties are purely contractual.

The complainant admits that for many years it has held a charter granted by the defendant, and that it acted in all respects in obedience to the laws enacted by the defendant until the fall of 1899, but it denies that it is in any sense the creature of the defendant, but asserts and shows that its existence as an organization of precisely its present character predated that of the defendant, and that it (the complainant), in conjunction with a similar organization in the State of Pennsylvania and one in the State of Delaware, created the defendant, and that the defendant owes its existence to the complainant rather than the contrary, and it argues that the subordinate position which, subsequent to the creation of the defendant, the complainant chose to occupy to it was purely voluntary and contractual, and that complainant had the right, at any time, at its free will and pleasure, to dissolve the same and resume its original independent existence with all its consequences, viz., the full and complete jurisdiction which it had previously exercised over

numerous local councils of the same order in the State of New Jersey.

This is one branch of the complainant's justification for its rebellion.

But another branch which, it is argued, supports the first, is that the defendant's organization, without any lawful or justifiable warrant whatever, in the month of June, 1899, materially altered and added to the objects of the order, thereby attempting to alter the contract which formed the very basis of the relations then existing between them, and that such conduct fully and thoroughly, of itself, justified the complainant in its rebellion and secession.

Let us now consider the facts upon which complainant relies in support of this dual position.

The complainant was incorporated by an act of the legislature of February 25th, 1875 (*P. L. 1875 p. 52,* private), but it was in existence as an unincorporated society from July 12th, 1869.

Its origin is this: The Junior Order of United American Mechanics was instituted at Germantown, Philadelphia, May 17th, 1853, by the organization, as an original unit, of Washington Council No. 1. This seems to have been organized under the auspices of an older organization known as the Order of United American Mechanics, and its idea seemed to be to operate upon and with very young men.

Later on other unit organizations, called local councils, were instituted in Pennsylvania until there were eight in all, and these eight, on March 13th, 1860, formed the state council of Pennsylvania. That council formed local councils in New Jersey and Delaware, so that between the years 1860 and 1869 ten local councils were instituted in the State of New Jersey pursuant to charters granted by the state council of Pennsylvania.

On July 12th, 1869, these ten councils organized the state council of New Jersey, the present complainant. In the meantime local councils had been organized in Delaware, and these in their turn organized a state council in Delaware. Then, on September 30th, 1869, the state councils of Pennsylvania, New Jersey and Delaware, being the only state councils in existence, organized the national council, which thereafter existed as a vol-

untary unincorporated association until April 10th, 1893, when it became incorporated, pursuant to a statute of Pennsylvania, by an order of the court of common pleas of Philadelphia county, Pennsylvania.

The local councils, now called subordinate councils, were composed of individuals, with a corps of officers.

The state councils are composed of delegates chosen by the subordinate councils.

The national council is likewise composed of delegates chosen by the state councils and of certain persons who have held certain offices in the state council.

All these councils—national, state and local—have written constitutions, by-laws and regulations.

The local councils exist by virtue of charters from the state council, and the state councils exist, with the exception, as claimed by the complainant, of those whose original organization antedates that of the national council, by virtue of charters granted by the national council.

Of course the important matter, forming the very core and heart of these organizations, is the object or objects of their existence.

That object is stated in the charter granted to complainant by the legislature, as follows:

"And be it enacted, That the objects of this association shall be to maintain and promote the interests of the American youth; to assist them in obtaining employment; to encourage them in business; to afford relief to the members thereof, and to defray the expenses of their funerals, or such other cases of distress as shall be defined by the by-laws."

Those objects, in almost the same words, are found in the several copies of the charter of the national constitution with which I have been furnished. One handed up to me by the defendant, printed in 1873, in the second article, is as follows:

"Sec. 1. The objects of this order shall be:

"*First.* To maintain and promote the interests of the American youth, and shield them from the depressing effects of foreign competition.

"*Second.* To assist Americans in obtaining employment.

"*Third.* To encourage Americans in business.

"*Fourth.* To establish a sick and funeral fund.

"*Fifth.* To prepare the youths of America to become members of the Order of United American Mechanics when they arrive at the proper age."

And then follows this important section:

"Sec. 2. The objects of this order shall not be altered unless proposed in writing at a previous stated meeting, and a copy of the said alteration shall be transmitted to each member of this body, and if adopted, the alteration shall be submitted to the members of the order for a vote thereon, and if approved by a majority, the alteration shall become part of this constitution."

This is important because article 20, the last of the constitution, contains this clause:

"Any alteration or amendment to this constitution must be presented in writing, signed by at least two members from different states. when it shall require two-thirds of the members present to adopt it, and it thereby becomes part of this constitution, unless it be an amendment to article 2, which shall only be altered or amended as provided in section 2 of said article."

This state of the written law of the national council with regard to amendments to the constitution continued without material change, as I understand it, up to 1899.

The result of these two sections or articles, in my judgment, is this: That while the provisions of the constitution, other than the declaration of objects, may be changed by a two-thirds vote of the members of the national council, the objects of the order cannot be changed without a vote of the original constituent members. This view is not now seriously disputed by defendant, and after years of litigation in various states has been acquiesced in by it.

Now what happened in 1899 was this: On June 22d, the third day of the annual session, the law committee of the national council, which had been appointed at the annual session of the previous year, presented a short report in writing, along with which they submitted "a revision of the national constitution and laws of the order." A motion was then made that the council resolve itself into a committee of the whole for the consideration of that report. A call for the ayes and nays was made and

ruled out of order by the chair. An appeal was taken from that ruling and the decision of the chair was sustained by a vote of seventy-six to forty-six. The council then went into a committee of the whole and remained in session until the hour for midday adjournment. At the afternoon session the council again resolved itself into a committee of the whole, and later on the committee rose and reported a code of laws which is set out in the appendix of the minutes and contains the new constitution and laws. A member then moved that the report be accepted and the laws adopted, which was agreed to. No vote was taken on that motion, so that it does not appear by the record that the constitution was adopted in accordance with the provisions of the twentieth section of the old constitution. It did not appear that two-thirds voted for it.

I am of the opinion that it cannot be said that it was so adopted, and such appears to have been the opinion of the supreme court of the District of Columbia in the case of *National Council, &c.,* v. *State Council for the District of Columbia,* where the very question was raised and dealt with. It is reported in *32 Wash. L. Rep. 728.*

There the national council filed a bill against the district council for the purpose of procuring a surrender of its charter and to enjoin it from the further exercise of functions under its charter granted by the national council, claiming that the charter had been lawfully revoked. That question involved the validity of the proceedings of the national judiciary of the national council in revoking the charter. It should be stated that the state council for the District of Columbia had rebelled and seceded at the same time for the same cause that the complainant herein had done so. The judiciary department was established by the new constitution of 1899. The supreme court of the District of Columbia held that the proceedings to revoke the charter were inoperative for lack of power under the constitution, and they also held that the change of the objects of the order, without submitting the matter to a vote, was inoperative, and the bill was dismissed.

On appeal from this decree, the court of appeals of the district, as reported in *34 Wash. L. Rep. 126,* held that the revised

constitution and general laws were not validly adopted because of the non-compliance with the articles of the constitution providing for such change. Judge McComas (at the bottom of *p. 128*) held ·that the objects of the corporation could not be changed without submitting the change to a vote of the constituent individual members of the order. He uses this language : "The fourth object of the order, which was 'to establish a sick and funeral fund,' was changed so as to read, 'to establish an insurance branch and a sick and funeral fund.' This change constituted a radical departure from the objects of the order hitherto. It is questionable whether such insurance scheme was permissible under the Pennsylvania charter of the national council." Judge Audenreid, in the court of common pleas No. 4, of Philadelphia, in the case of *Commonwealth of Pennsylvania, ex rel. Woods et al.,* v. *Wobensmith et al.,* in his opinion rendered May 10th, 1904, concludes : "If the national council lacks, as we think it does, the power to change the objects of the order, its attempt to do so amounts to nothing, except it be regarded as a preliminary step to its submission of the question of making such a change to a vote of the membership at large. At least, if not *ultra vires,* such a radical change ·in one of the objects of this order was required by its constitution and laws in force to be submitted to a vote of the membership, and to be adopted only after a majority of the members had approved the change, and such method was not pursued. It is true that the proposed Minneapolis revision of the objects, constitution and laws substituted a different method for changing the objects of the order. This brings us to the main question in dispute in this case : Was the scheme of revision of objects, constitution and general laws, proposed by the law committee to the Minneapolis session, lawfully adopted?"

He then examines the subject and reviews the minutes of the national council, and (at *p. 131*) uses this language:

"We agree with the appellant that the integrity of the official proceedings of this order cannot be invalidated by such parol testimony. We agree, also, that ordinarily the minutes must be taken to import that the proceedings were regular and that all of the ordinary and customary incidents to give validity to the

action recorded duly transpired. We cannot agree, however, that this language, 'P. S. C. Collins, of Pennsylvania, moved that the report be accepted and the laws adopted, which was agreed to,' imports all of the things required by article 25 of the constitution to bring about a radical comprehensive revision of this very constitution and these general laws. The statement of the minutes that Collins' proposition was 'agreed to,' imports only that a quorum of the national council was present and that a majority voted for it."

He affirms the decree below, dismissing complainant's bill.

I agree with the reasoning and result of that case and conclude that complainant was justified in withdrawing its allegiance to and connection with the defendant.

It does not lie in the mouth of the defendant to say that if the proceedings to change the constitution were inoperative, then no harm has been done to the complainant, for if the latter had continued its connection with the defendant it would have thereby ratified the new constitution and been estopped from denying its validity.

It is further urged that no new or additional obligation was imposed upon the national council by the scheme for an insurance branch which was adopted as a part of the report which included the new constitution. But the question is not what was actually, or has been actually, done, under the new constitution, but what may hereafter be done. The changes in the objects of the order were these: Instead of the words "to establish a sick and funeral fund," we find the words "to establish an insurance branch and a sick and funeral fund," and another article of the new constitution provides that the national council may, by law, provide for the insurance of the members of the order. This language gives power to the council to engage in the business of insuring the lives of its members. And if the plan they adopted at Minneapolis does not, in effect, amount to engaging in that business, it may hereafter do so in a direct and binding manner. And, in my judgment, the character of this provision of the constitution is to be judged of, not by what has been done, but what may hereafter be done under it. *Henderson* v. *Atlantic City, 64*

*N. J. Eq. (19 Dick.) 583* (at *p. 587*); *Stuart* v. *Palmer, 74 N. Y. 183.*

In further justification of the action of the complainant, its counsel points out that it is unlawful for the complainant to engage in the business of life insurance in the State of New Jersey. *State* v. *Taylor, 56 N. J. Law (27 Vr.) 49,* and on appeal *(p. 715)*; *Golden Star Fraternity* v. *Martin, 59 N. J. Law (30 Vr.) 207.*

I hold, then, that the complainant was entirely and fully justified in withdrawing its fealty from and association with the defendant, and that the defendant was powerless to discipline and expel it upon the ground upon which it acted, namely, the misbehavior of the complainant in refusing to levy the tax imposed by the national council. Be that as it may, it is quite clear, and both parties agree, that in fact and law all relations between the parties have been fully and completely severed. The defendant says: "We expelled you." The complainant says: "We seceded and withdrew our allegiance from you."

We have now to inquire what was the effect of this withdrawal and expulsion.

The complainant contends that it remained in undisputed control in the State of New Jersey. It contends that it is the only true "state council" for this state. It alleges that it adheres to the original and ancient faith of the order and, according to familiar principles, is entitled, for that reason, to the controlling position in the State of New Jersey, even though it were in the minority. *Hendrickson* v. *Shotwell, 1 N. J. Eq. (Sax.) 577; Altmann* v. *Benz, 27 N. J. Eq. (12 C. E. Gr.) 331.* That case, which is directly in point, was followed in *Fair* v. *First Methodist Episcopal Church, 57 N. J. Eq. (12 Dick.) 496, 502,* and the decree in the last cause, in accordance with that opinion, was affirmed by the court of errors and appeals. *60 N. J. Eq. (15 Dick.) 485.*

Numerous other cases in other states were cited in support of the same doctrine.

Moreover, out of the two hundred and eighty-four local councils in this state, which have all been formed from time to time under the patronage and by the charter of the complainant, all

but two have remained loyal to complainant and are still its constituents, and, so to speak, willing subjects. So that it is in actual possession and enjoyment of all its ancient rights and franchises.

It is proper to mention here that the means adopted by defendant to displace the complainant was and is the creation of several new local councils which shall be loyal to it, sufficient in number to warrant, under the defendant's constitution, the creation of a state council in New Jersey.

At the filing of the present bill, in May, 1904, there were, as before remarked, in existence in New Jersey, two hundred and eighty-four subordinate councils, all of which, except two, recognized the authority of the complainant and repudiated that of the defendant.

The defendant's agent, one Forrester (who is also a defendant), had, before the filing of the bill, organized two new councils, making four in all loyal to the defendant. The defendant's new constitution requires five councils in a state to warrant the institution of a state council. It was after Mr. Forrester had obtained the four councils loyal to the defendant, and was engaged in organizing the fifth, that this bill was filed and the work stopped by injunction.

Now the complainant claims that it alone, in New Jersey, has authority to issue charters to loyal councils. It asserts, and is therein sustained by the constitution and by-laws of the national order, as well as its own, that the defendant has no power to grant a charter to a local council in a state or territory where there is already a state council, and it alleges that it follows that it has no right to do so in this state.

Further, it relies upon the language of its state charter of 1875, the fourth section of which expressly provides that the complainant shall have power to grant charters to subordinate councils of the Junior Order of United American Mechanics in the State of New Jersey, according to the regulation, by-laws and rules adopted to govern the same, &c., and it argues that that authority is, from the very nature of the case, exclusive.

It argues that it is entirely inadmissible on general principles that there should be two entities empowered to grant charters

of that character in one state.  The result of such action would
be a state of confusion and chaos.  The entire scheme of this
organization, from its origin in 1853 down to the present time,
is a coalition of local or subordinate councils by chosen repre-
sentatives into a superior council, called the "state council,"
all according to territorial limits, and in each case the state coun-
cil has been exclusive within the limits of its state, and has
taken the name of the state, the single exception as to name, of
course, being the District of Columbia.  The existence of two
state councils bearing the same name and having the same juris-
diction in one state is entirely inconsistent with the nature of the
order.  And while at the outset of the hearing counsel for the
defendant did faintly insist, as before remarked, that the de-
fendant's plan of organizing sufficient local councils in New
Jersey loyal to it in order to organize a state council loyal to it
did not necessarily exclude the existence and jurisdiction of
complainant, counsel finally abandoned that position and boldly
claimed that it meant the practical destruction of complainant
and the compelling all the two hundred and eighty-two councils
now loyal to complainant to come under the jurisdiction of the
state council to be erected by defendant.

In support of this theory counsel for the defendant take radi-
cal grounds.  They assert, as I understand their argument, that
the decree of expulsion made against complainant by the na-
tional council resulted in its extinction as an entity, and if that
decree was inefficient for that purpose that the secession of the
complainant from the national council had the same effect.

The gist of their argument, as I understand it, is that the
existence of the complainant's association for all these years
has been so intertwined and combined with that of the defendant
that the separation of the two means social death to the com-
plainant.  In other words, they assert that it is quite impossible
to conceive of a state council of the Junior Order of United
American Mechanics which is not subordinate to and, so to
speak, a part of the national council.

In support of this theory counsel pointed out the fact that
for all these years the complainant has acted with and in com-

plete subordination to the national council, and without any apparent reliance upon its state charter.

In the first place, up to the year 1900, the first article of its constitution commenced in this wise:

"Sec. 1. This body shall be known as the State Council of the Junior Order of United American Mechanics of the State of New Jersey.

"By virtue of a charter granted by the National Council of the United States of North America, it is the legislative head of the order in New Jersey, with power to make its own constitution and laws, also the constitution and rules of order of subordinate councils under its *jurisdiction;* *provided they conform to the laws of the national council or general laws.*"

Farther on, they point out, other articles refer to the national council and recognize its existence and authority, and the state council has uniformly, by its delegates, taken part in the deliberations and proceedings of the national council and has collected from the local subordinate councils and paid over to the national council the tax imposed by that body.

But it must be borne in mind that all this was purely voluntary on the part of the state council, and that its existence as a state council preceded that of the national council, and from this fact alone its ability to exist as a social entity, independent of the national council, clearly appears. Moreover the ability of the local subordinate councils to exist independently even of the state council must be an admitted fact, for the existence of many of those in New Jersey preceded that of the state council.

In point of fact each local subordinate council has its own constitution and by-laws, and the logical result of the situation seems to be, as appears from an examination of the literature of the association, that while the national council cannot exist without the support of the several state councils, and while the state councils cannot exist without the support of the several local subordinate councils, those local subordinate councils are the original constituent units or atoms, who, once having acquired life and existence, may continue that life and existence without reference to or assistance from either state or national council.

These local subordinate councils and their individual members comprise and form the very life and soul of the whole order. It is the individual members of these local subordinate councils which meet and associate together, levy individual taxes, accumulate funds for sick benefits and funeral expenses. Those accumulations at this time by the two hundred and eighty-two loyal councils in the State of New Jersey amount to over one-half million dollars. Delegates from these councils constitute the state council and at the same time support it financially. Presumably they have supported it in its rebellion and secession from the national council, and in the alteration of its constitution, which has been revised in such manner as to entirely ignore the national council. Such alteration appears in part from the following extracts:

"Section 1. This body shall be known as the State Council of the Junior Order of United American Mechanics of the State of New Jersey, by virtue of a charter granted by the legislature of the State of New Jersey, approved February 25th, one thousand eight hundred and seventy-five. It is the supreme and legislative head of the order in the State of New Jersey.

"Sec. 2. It shall have the power to grant charters to subordinate councils of the Junior Order of the United American Mechanics in the State of New Jersey; to suspend, revoke or annul any of said charters at any time when any subordinate council shall refuse, neglect or fail to obey all the laws of the order. It shall make the constitution and rules for the government of all subordinate councils, and alter, change, amend or add thereto, from time to time, at its will and pleasure.

## "OBJECTS.

"*First.* To maintain and promote the interest of Americans, and shield them from the depressing effect of foreign competition.

"*Second.* To assist Americans in obtaining employment.

"*Third.* To encourage Americans in business.

"*Fourth.* To establish a sick and funeral fund.

"*Fifth.* To maintain the public school system of the United States of America, and to prevent sectarian interference therewith, and uphold the reading of the Holy Bible therein."

Under that constitution the order in New Jersey has been existing and thriving for five years past or more.

These simple facts seem to be the refutation of the argument

so ingeniously put forward by counsel for the defendant on this part of the case.

I have examined the constitution of the national order and I found in it, up to the adoption of the new constitution in 1899, nothing to warrant the idea that it had any destructive power over the state councils. By its constitution it has not the power to install, organize or create a subordinate council in any state where a state council exists. I find no delegation of power by the state council to the national council implying any such right. The whole connection, as held in the previous action in our courts by the national council against the state council, was purely contractual, and there was nothing in the contract which, in my judgment, precluded the state council from withdrawing at its option.

While the constitution and minutes of the proceedings of the state council do, as before remarked, recognize and constitute a strong admission of its relation to the national council, I find in them all nothing that amounts to an estoppel as against the state council to prevent it from assuming its independent existence.

The case, by its facts, is not brought within the scope of the precedent of the national government and the governments of the several states. There the national government had the right, under the constitution, as most of us believe, to enforce the law of the United States in the seceding states so far as those laws applied.

Be that as it may, it had the power, by the strong arm of the army and navy, to subdue armed rebellion, but it never did attempt to destroy the entity of the individual states.

But the complainant carried out its acts of rebellion, as we have seen, by adopting a new constitution and falling back on its charter from the State of New Jersey, and a faint attempt was made to show that complainant had abandoned its state charter and had no right to resume it and act under it. I do not think the allegation is sustained by the proofs. But, however that may be, it is a familiar rule that no court has a right to listen to a collateral attack of this kind. The attorney-

general is the only party who has a right to complain of it, and that must be by a direct action brought for that purpose.

One other suggestion put forward by counsel for defendant on this part of the case is worthy of notice. They assert that the charter granted by the legislature to the complainant contains in itself, properly construed, a recognition of its obligation to the defendant and its dependence upon the defendant. I cannot so construe it. I find nothing in its language to warrant that notion. On the contrary, section 3 declares

"that the said corporation shall have power to renew and enlarge said constitution and by-laws as may be necessary for the government of its affairs and the furtherance of its objects, and the same to amend and alter in such manner as may be therein provided; provided, that the same shall not be inconsistent with the provisions of this act, constitution and law of the state and of the United States of America, and the constitution and by-laws now in force to be good and valid until altered, amended or abrogated by the said corporation."

This seems to give the corporation or association power to do just what it has done.

It seems to me, therefore, quite clear, after a consideration of the very elaborate arguments presented to me, that the complainant's position in this behalf is sound and cannot be disturbed. It seems to me that it is still, in law and fact, a social entity known all these years as the "State Council of the Junior Order of United American Mechanics of New Jersey."

In this position it is fortified by the charter granted to it by the legislature in 1875, as above cited.

I am further of the opinion that the defendant is not justified, either in law or in equity, in attempting to displace and destroy the complainant by the means which it is attempting to adopt for that purpose.

The remaining question is whether this court will intervene by the strong hand to enjoin the defendant from further attempting to destroy the complainant.

On this subject complainant cites a very recent case much like the present, dealt with in the first instance by the chancery court of the city of Richmond, in the State of Virginia, and afterwards, on appeal, by the court of appeals of Virginia.

The decree in the chancery court was made July 24th, 1904, and the opinion, on appeal, appears to have been made known June, 1905.

The suit was brought by the State Council of the Junior Order of United American Mechanics of Virginia against the national council of that order and certain individuals, and its object was in effect the same as that in the bill in this cause, and the decree, both of the chancery court and the court of appeals, was in favor of the complainant and against the defendant.

That case differs from the present in this that the order in the State of Virginia was instituted originally by the defendant and grew up under its authority and jurisdiction, and was not chartered by the state until 1900.

The order in the State of Virginia, as well as in the States of New York, Pennsylvania and New Jersey and the District of Columbia, rebelled against the authority of the defendant at or about the same time and for the same cause, and the state council of Virginia procured an act of the legislature, in February, 1900, incorporating it.

That act is similar to the act incorporating the complainant herein, with one exception. The charter of the complainant herein, by its fourth section, declares that the said corporation "shall have power to grant charters to subordinate councils," &c. The Virginia charter granted "exclusive authority" for that purpose and declared that such council would be the supreme head of the order in Virginia.

About a year later, in 1901, the national council caused a new state council of Virginia to be organized, at Alexandria, by the same name as that of the complainant in that cause.

The opinion of the court of appeals says: "This new organization denies that the plaintiff is the supreme head of the order in Virginia, and the validity of its charter, and is doing everything in its power to destroy the plaintiff and to prevent its successful operation under its charter and has adopted a seal substantially like that of the complainant."

The prayer was that the new Alexandria organization may be declared illegal and that of the plaintiff be held valid and the defendant enjoined from continuing the use of the seal and from

carrying out the objects for which it was organized and from granting charters to subordinate councils and from interfering with the complainant in the pursuance of its objects.

The decree of the chancery court, which was affirmed by the court of appeals, gave the complainant all the relief which it asked.

The difference between that case and this is twofold. *First,* the complainant's case therein was weaker than the complainant's case herein, because there complainant was the offspring of the defendant and owed to it its existence and had originally no state charter, while here the contrary is true. On the other hand, its charter gave it the "exclusive" right to grant subordinate charters, and on that ground the court of appeals puts its decision.

The case establishes the doctrine which, I think, is entirely consonant with reason and justice, that if the complainant here has the exclusive right to grant charters and to be, in fact, the only state council of the order in New Jersey, then the complainant is entitled to relief.

Now, the general rule is beyond all question that the giving by the legislature, by a direct special charter to an association, a corporate existence by a particular name is a grant of the exclusive right to use that name and to be in fact and in law the only association of that character and that name within its territorial limits. And, as before remarked, this is entirely consonant with the entire scheme of the existence of this order. It is well nigh absurd to suppose or attempt to conceive that there could be two such orders in New Jersey, and this is admitted by the defendant. If so, then, it seems to me complainant is entitled to relief.

Against this several objections are made. One is that no property rights are involved, and that relief of that nature is only granted to trading corporations on the score of unfair competition. But I am unable to apply that reasoning to this case. In the first place, property rights are here involved. Complainant makes two specifications on that score. One is that the complainant organization indulges in a little business of printing and publishing certain literature for the order and derives a

small profit from that, which helps to pay its running expenses. I place little reliance upon that point.

But in the second place, by the state constitution of the order, it has the power, in certain cases therein provided for, to act upon the subordinate lodges and take possession of their property, as was done by this court in the cases of *Grand Lodge, Knights of Pythias of New Jersey,* v. *Germania Lodge, No. 50, et al., 56 N. J. Eq. (11 Dick.) 63,* and *Schubert Lodge, No. 118, Knights of Pythias of New Jersey,* v. *Schubert Kranken Untersturzen Verein et al., 56 N. J. Eq. (11 Dick.) 78.* And two actions are now pending in this court against the two out of the two hundred and eighty-four local councils who have refused to acknowledge the jurisdiction of complainant and have joined in assisting the defendant to destroy the complainant by establishing in its place a loyal state council, loyal to the defendant.

But quite independent of the question of the right of succession by forfeiture, the mere position of curator or supervisor of numerous constituent associations, possessing in the aggregate a large accumulation of property, gives the complainant a standing in this court in this behalf.

But the defendant claims that the complainant can have no right to the name "Junior Order of United American Mechanics," because that name is a general one in use all over the United States. But the claim is not to the use of that name' except as applied to the State of New Jersey. The corporate name of the complainant is "State Council of the Junior Order of the United American Mechanics of the State of New Jersey." The words in question have no descriptive meaning if we divorce them from the words "the State of New Jersey." The nature of the organization, as we have seen, is distinguished by states and territories, and the distinguishing part of the complainant's name is *the State of New Jersey.* Now, as the Virginia case held, the state has the power to give the privilege of using that name within the territorial limits of said state to a single institution, and that, in my judgment, it has done here.

I will now consider some of the authorities cited by counsel on each side.

The first case in point of time is *Derry Council, No. 40, Jr.*

*O. U. A. M.,* v. *State Council of Pennsylvania, 197 Pa. 413; 47 Atl. Rep. 208.* That was a bill in equity to restrain the levy of a per capita tax on the members, and to nullify and declare invalid certain proceedings of the national council. It arose out of the same rebellion as did the present case.

The ground on which the injunction below was asked for, and, in fact, granted, was not the same as is the basis of the complainant's action herein. It was put upon the ground that the meeting of the national council, which was a creature of the State of Pennsylvania, had been held outside of the state limits, to wit, in Minneapolis, and hence its action was invalid. On appeal, this ground was held untenable, and then the ground was taken by the plaintiff, in support of the decree below, that the national council had no right to levy and enforce a tax. But it was held that the state council had the right, in obedience to the order of the national council, to levy the tax, and the decree was reversed.

None of the questions raised in this case were there involved.

The next case was (*Commonwealth* v. *Wobensmith*) a quo warranto to test which of certain persons were properly and of right the officers of the state council of Pennsylvania.

The matter had been before the judiciary of the national council and had been decided in favor of the defendant. It was held by the court of common pleas in Philadelphia that the action of the national judiciary was conclusive. The validity of the action of the Minneapolis meeting, which established the judicial department of the national council, was attacked and the jurisdiction of the judicial department was questioned.

This jurisdiction Judge Audenreid also sustained. Whether in so doing he actually ran counter to the decision of the courts of the District of Columbia, I have not looked into or considered. But on the principal ground upon which the complainant herein seceded from the national council, he did distinctly agree with those courts, and held that the defendant could not alter the objects of the order in the way it attempted. He used the following language:

"Whether by re-writing the statement of its purposes and

'objects of the order' the national council did not exceed its powers is seriously questionable. The inclusion among its 'objects' of the establishment of an 'insurance branch' seems hardly to fall within the purposes mentioned as those of the corporation in its charter application. If the purposes of the corporation were to be changed it could be done only with the approval of the court which decreed its incorporation after proper advertising, &c., as provided by law and the rule of the court. Moreover, under the society's original constitution, the 'objects of the order' were not to be altered save by the common consent of the majority of the members at large after approval by the national council. We are quite certain that until the consent of more than half the members of the Junior Order of the United American Mechanics has been received, the changes in the 'objects of the order' provided for in the amended constitution adopted in Minneapolis in 1899 are inoperative."

The result of the litigation in Pennsylvania was to hold—

*First.* That the attempt to engraft the insurance branch upon the order by the proceeding in 1899 was inoperative and void.

*Second.* That the national council, as organized under the laws of Pennsylvania, had no power to enter into the insurance business as proposed by its action in 1899.

*Third.* That the mode of adding to its objects, adopted by the defendant, was improper and inefficient.

These matters have since been amended and cured—*first,* by an alteration of the charter of the defendant in such manner as to give it power to enter into the insurance business, and *second,* by submitting the question of a change of the original objects of the association by adding an insurance branch to the vote of the members of the subordinate councils remaining loyal to the national council. All this has been done since the complete separation of the complainant and the national council, and since the filing of the bill in this cause, May 16th, 1904.

It is hardly necessary to say that such action so taken cannot affect the rights of the complainant herein.

Another Pennsylvania case was in the court of common pleas of Dauphin county, and on appeal from that court to the superior court of Pennsylvania. It was a suit brought by *Wilmer Crow* v.

*Capital City Council, No. 327.* The plaintiff had been a member of that subordinate council and had been dismissed therefrom by the national council after a trial in the courts of that council upon charges preferred against him of which he had notice, and where, after due proof adduced, judgment went against him. The court of common pleas issued a peremptory writ of *mandamus,* restoring him to membership. The superior court reversed that judgment on the ground that he was bound by the judgment of the highest court of the order.

The next case arose in the State of New York. It was an action brought by the *State Council of Junior Order United American Mechanics of the State of New York* v. *New York State Council, &c., et al.,* and its object was substantially the same as that of this suit, with this exception, as I understand the report of the case furnished me, the plaintiff framed its case with a view of maintaining its position as a loyal dependent of the national council and did not avow a separation.

In that case all the subordinate councils and the state council had their incipient existence in and from the national council. The plaintiff received its charter from the national body in 1873 and was incorporated in 1881 under the general laws of the State of New York applicable to societies of that sort.

Its situation, then, varies from that of the complainant herein in two respects. *First.* It was the offspring, so to speak, of the national council. *Second.* It did not exist as a corporation by virtue of a special charter. In September, 1900, it refused to levy a *per capita* tax in obedience to the national council. For this insubordination it was disciplined by the judicial department of the national council, and a judgment was entered revoking its charter.

Shortly afterwards the defendant, a voluntary unincorporated association, was organized and received its charter from the national body, and its seal was identical with that used by the plaintiff before plaintiff's incorporation. Upon these facts, Judge Steckler, of the supreme court, sitting at special term on final hearing, held as follows:

"The defendant occupies exactly the same position towards the national council and the subordinate councils in this state as the

plaintiff occupied before its charter was revoked. In this action the plaintiff seeks to restrain the defendant from the use of its name and seal. On the facts hereinbefore stated it is evident that no injunction could be granted. But the plaintiff's contention is that the revision of the constitution at the convention held at Minneapolis in 1899 is inoperative, for the reasons, among others, that the members of the order were not properly notified of the amendments, and that they were not passed by a two-thirds vote, and that as the *per capita* tax was based on one or more of the amendments, such tax was unauthorized, and the plaintiff could not be required to levy it. And the plaintiff further claims that its charter has not been revoked because the judgment of revocation was entered prematurely, having been entered nine days after the date fixed for trial instead of after the lapse of ten days from the trial, as provided by the constitution and laws of the order. I do not think that in this action for the specific relief which is asked the plaintiff can avail itself of the objection that the amendments of the constitution are inoperative. It does not appear that the representatives of the plaintiff at the Minneapolis convention objected to the methods of proposing amendments, or that they claimed that the amendments were not carried by a two-thirds vote. Such objection, if made at the time, might, if tenable, have been obviated. Nor does the fact that the judgment of revocation was entered prematurely aid the plaintiff, for even if such premature entry was not a mere irregularity the defect would not of itself better plaintiff's standing in a court of equity. On all the facts I do not think that the case is one where, in the exercise of a sound discretion, injunctive relief should be granted."

The copy of the opinion just quoted, which was furnished to me, has annexed thereto a statement of facts found by Judge Steckler and the decree of the court thereon.

With regard to the question of the proper adoption of the constitution of 1899 the opinion is not in accord with that of the courts of the District of Columbia, and I think the reasoning of the latter court is not met by what little reasoning Judge Steckler indulges in. With regard to the attempt to change

the objects of the organization, which is much the more serious of the two matters, the question does not seem to have been raised at all before him. And I may say that the reasoning of the opinion and the result arrived at is not satisfactory to me.

The consideration which I gave to the subject a few years ago led me to the conclusion that the question whether an injunction should be issued in favor of the complainant on the final hearing of his cause does not rest in the 'discretion' of the judge in the sense in which Judge Steckler seems to use that word, but must depend upon his judgment upon the actual merits of the cause, arising out of a judicial consideration of the law as applied to the facts. See *Hennessy* v. *Carmony, 50 N. J. Eq. (5 Dick.) 616* (at *p. 625*), and see the distinction between interlocutory applications for injunctions and those on final hearing, in *Higgins* v. *Water Company, 36 N. J. Eq. (9 Stew.) 541.*

I have now referred to all the adjudications upon facts arising out of what may be termed the rebellion of 1899 which have been brought to my notice.

I will now refer to another batch of cases cited by counsel.

On the topic of the use of similar names I am referred to *Black Rabbit Association* v. *Munday, 21 Abb. (N .Y.) N. Cas. 103,* which came before Judge Donahue in 1887. The case showed that there was an unincorporated purely voluntary association called the Black Rabbit Association, whose objects were amusement. It had been in existence and had used the name for a considerable period of time. Some of the individual members, constituting a minority of the whole, being dissatisfied with some action of the majority, associated themselves voluntarily and became incorporated by the same name, and then by their corporate name sued the members constituting the majority of the old association for an injunction against their use of the name, and it was refused. There was no scintilla of property rights involved. The headnote is this:

"The dissatisfied members of a voluntary association cannot, by incorporating themselves, deprive the voluntary association of the right of using its own name, and a temporary injunction for such purpose will not be granted."

It requires little explication to show that this case has no application here. The complainant here is not an infant, but may be said to be hoary with age, and, like the defendant in the case just cited, is standing to maintain rights which it has enjoyed for over thirty-five years.

In the same line is the case of *Henry* v. *Deitrich, 84 Pa. St. 286.*

Another case is *Colonial Dames of America* v. *Colonial Dames of New York et al., 29 Miscel. Rep. 11 (1899)* ; *63 App. Div. 615; affirmed* without opinion, *173 N. Y. 586.* There were in that case two or more societies of substantially the same name and working along the same lines for several years. The object was to promote the study of the colonial period of the country and perpetuate the memory of the men, women and events of those times, and also to protect and preserve any relics, whether buildings or writings or of some other character, still surviving that period. Several societies were formed, one in New York and one in Philadelphia, and one called the National Society of Colonial Dames. The one in New York, which antedated in point of time the others in New York, sued two of the latter to restrain the use of its name. The judge who spoke for the court in the report which I saw said: *"The plaintiff, with full knowledge, has stood by for all these years and made no attempt to prevent the defendants from using the name* they have severally adopted. They have gone on increasing in membership and enlarging the field of their operation. Some idea of the importance of the work done by them can be derived from the fact that through the instrumentality or the initiative of the Rhode Island branch alone of one of the defendants a sum exceeding $21,000 was raised and spent for the relief of our soldiers during the recent Spanish war, while the other defendant has, since its organization and for various purposes, collected and disbursed a still larger sum."

The headnote is as follows:

"The use of the title 'Colonial Dames' will not be restricted to the corporation which first adopted it where it appears that another corporation and an unincorporated society, which are also using it, are not conducted for pecuniary profit, and that all three societies are merely seeking patriotic and philanthropic ends."

This exposition shows that the distinction between that case and this is quite clear and distinct.

Another case of the same kind is *International Committee of Young Women's Christian Association of Chicago* v. *Young Women's Christian Association of Chicago,* 194 *Ill.* 194; 56 *L. R. A. 888.*

The plaintiff, the Young Women's Christian Association, was incorporated in 1877 without the word "Young" in its name, but which was added by regular proceedings in 1887 and was in active existence from that time on. It maintained two boarding-houses, a free medical dispensary, library and employment bureau, &c., all by the voluntary contributions of its friends.
· No religious or sectarian test had been required, but simply a Christian character.

Later on a movement was made to add as a test for membership what was called the "evangelical test," and finally, in 1891, an association became incorporated under the name of the International Committee of Young Women's Christian Association. This latter began work along the same lines as the plaintiff, and interfered with the plaintiff's machinery for collecting money from benevolently disposed individuals. It thereupon commenced its suit, praying injunction against the defendant's operating under that name or any similar name in such a manner as to deceive and mislead the public into believing that the defendant is the plaintiff, or a committee or representative of the plaintiff, and from organizing local associations under the name of the Young Women's Christian Association, or any similar name.

The court of first instance, after a full hearing, dismissed the plaintiff's suit. From that decree the plaintiff prosecuted an appeal to the appellate court of that district, which reversed the decree of the court of the first instance and directed it to grant the plaintiff relief.

From that decree the defendant appealed to the supreme court, where the last decree in favor of the plaintiff was affirmed.

The case in all its aspects more nearly resembles the present than the others just cited.

That a corporation of this kind will be protected in the use of

its name. is laid down by Mr. Thompson in volume 7 (supplement) of his *Commentaries on Corporations* (at § *8192*). And this brings us to a case cited by Mr. Thompson, and much relied upon by the defendant herein, to wit, *Grand Lodge, &c.,* v. *Graham, 96 Iowa 606; 31 L. R. A. 133.*

The case is voluminous and was decided on a demurrer to and a motion by plaintiff to strike out parts of the defendant's answer.

The demurrer and motion to strike out were decided against the defendant in the court below, whereupon the defendant appealed and succeeded in reversing the judgment of the court below. The reversal was mainly on somewhat technical grounds.

As in the present case, the origin of the Order of United Workmen had its rise in Pennsylvania, where, after several subordinate lodges had been created, a grand lodge for that state was created. Then other grand lodges were created in other states, and finally these united and created a supreme lodge, and that supreme lodge afterwards chartered the grand lodge of Iowa, which was organized upon condition that it should be subordinate to and recognize the authority of and abide by the rules and decision of the supreme lodge.

This grand lodge in Iowa organized a great number of subordinate lodges in different parts of the state, and, as I understand the case, they all engaged in the life insurance business among their own members, but none of them, not even the grand lodge, were incorporated. Later on a portion of the lodges in Iowa seceded from the supreme lodge and associated themselves together and assumed the same name as the original grand lodge, and procured, without lawful authority, the executive officers of the state to assent to and to issue to it a certificate of incorporation by that name, and had been doing business under the authority of the state executive for some ten or more years before suit brought.

In the meantime the old grand lodge continued its business as before, with great success and increase of members, so that for many years two organizations were in existence using the same name, the older one, which was first in existence, not being incorporated, but being first in the field with the use of the name

Grand Lodge of the Ancient Order of United Workmen of the State of Iowa.

In this posture of affairs the incorporated one, and the younger in point of time, sued the older to enjoin it from the use of the name. In this action the court held that it could not succeed, because the name was originally assumed by it unlawfully and contrary to the statute, and that the executive officer of the state could not authorize or legalize it as against the older association by his act or permitting its use.

The headnote applicable here is this:

"The right to use the name Grand Lodge of the Ancient Order of United Workmen of Iowa cannot be claimed by a seceding body merely because it has become incorporated, to the exclusion of the body from which it seceded, which previously had used the name, and continued to do so, without incorporation.

"The certificate of the auditor as to the right of a corporation to a name is not binding upon any other body claiming the right to the name."

It was further held that the plaintiff's failure for ten years to bring suit to establish its exclusive right to the use of the name was fatal.

In comparing that case with the present we find that there the secession was confined wholly to the limits of the State of Iowa, and it was apparently by a minority of the whole order in that state, which left the original body in complete possession of the field of work and the use of its own name, which it continued to use for ten years without interruption before the commencement of the suit.

We find the seceding body incorporating itself under general laws and unlawfully assuming a title and name of the older association, which, however, it was unable to displace.

A parallel case in New Jersey would be the organization of the three or four subordinate councils in New Jersey into a state council and its organization and incorporation under our general laws by the same name as the complainant herein, and then an attempt by it to prevent the complainant herein from continuing its operations.

The precedent of the Iowa case in such a suit would be entirely in favor of the present complainant.

Another case cited was *Supreme Lodge of the Order of Knights of Pythias* v. *Improved Order, Knights of Pythias, 38 L. R. A. 658.* That case was this: The order of the Knights of Pythias had many subordinate lodges whose members spoke German and the proceedings of those lodges had been printed in that language. The supreme lodge passed a law requiring that all proceedings should be in the English language, whereupon one or more lodges in Michigan, whose members could not read English, seceded and organized a lodge or lodges under the name "The Improved Order of the Knights of Pythias." The action was brought to restrain the use of that name. The court held that the action on the part of the supreme lodge was a change of policy which justified the formation of the defendant lodges with a new name, and held that the addition of the word "improved" so far varied the name as to show that it was a distinct society from the ordinary Knights of Pythias and not liable to mislead anyone, and that no one would suppose that the Improved Order of the Knights of Pythias was the same Knights of Pythias as the complainant. The court distinguished that case in this respect from *Russia Cement Co.* v. *Le Page, 147 Mass. 206,* and *Hohner* v. *Gratiz, 52 Fed. Rep. 871.*

Counsel for the defendant rely on a line of cases of which *McFadden* v. *Murphy, 149 Mass. 341; Gorman* v. *O'Connor, 155 Pa. 239; 26 Atl. Rep. 379,* and *Allmann* v. *Benz, 27 N. J. Eq. (12 C. E. Gr.) 331,* are samples, in support of the position that the party which stands by the regular organization, although a minority in numbers, is entitled to recognition and support by the courts. But in all these, and numerous other cases, the party claiming regularity must show that it stands by and adheres to the original faith, principles and objects of the association. The cases are numerous and it is unnecessary to cite them, beyond what have already been cited, in support of the doctrine that the court will, where the question is properly raised, inquire into even the religious faith of an association, and *a fortiori* into its objects and purposes, to ascertain which party, in case of a schism, is adhering to the original doctrines, objects and purposes of the association and recognizing that

party as having the legal right. Here we have already seen that the complainant is adhering and standing by the original purposes of the association, and the defendant has attempted to change them and to compel the complainant to accede to such change.

The complainant advanced the proposition that a society organized as was the complainant under the laws of New Jersey could not lawfully submit itself or its members to an authority existing out of the state. He cites *Lamphere* v. *Grand Lodge of Ancient Order of United Workmen, 47 Mich. 429 (1882)*. The Ancient Order of United Workmen was a corporation that indulged in mutual insurance, and the branch in the State of Michigan was incorporated by that state. The plaintiff was an insured member of the society in Michigan and that society was subject to the superior jurisdiction of the Kentucky society. The supreme lodge was organized in Kentucky. The Michigan society had suspended the plaintiff because he declined to pay an assessment imposed by the supreme lodge of Kentucky. The court said: "The plaintiff stands suspended by the respondent and thereby loses his insurance for refusing to recognize the order of the supreme lodge, which is a corporation existing under the laws of Kentucky and not subject to this jurisdiction. The assessment was made to pay losses on risks taken by the order in many states and by their state grand lodges. The respondent is a Michigan corporation existing under chapter 94 of the compiled laws. The relator is not liable to pay the assessment. *It is not competent for the respondent to subject itself or its members to a foreign authority in this way.* There is no law of the state permitting it, nor could there be any law of the state which would subject a corporation created and existing under the laws of this state to the jurisdiction and control of a body existing in another state and in no manner under the control of our law. The attempt of the respondent to do this was to set aside and ignore the very law of its being. The *mandamus* will therefore issue as prayed."

That case was followed by the case of *Grand Lodge, &c.,* v. *Slepp et al.,* in the superior court of Pennsylvania, October,

1883. The defendants in error were members of Corona Lodge No. 23, of the Order of United Workmen of Pennsylvania, and sued the grand lodge in *mandamus* to compel it to restore them to their rights, from which the Corona lodge had deposed them, in obedience to the action of the grand lodge. The Corona lodge received its charter from the grand lodge and the grand lodge also instituted lodges in Indiana, and then levied an assessment on the individuals of the lodges in Pennsylvania in aid of the grand lodge of Indiana. The Corona lodge declined to pay the assessment on the ground that it was without authority of law and in violation of the terms of the contract entered into between them. The opinion of the court below, which was adopted by the court above, held that the Corona lodge, notwithstanding it had participated in the proceedings which resulted in the assessment, was not bound by the assessment and was justified in refusing to pay it. The court said: "There seems to be no doubt that Corona lodge, impliedly at least, if not expressly, from the time of the organization of the supreme lodge in 1873 until this difficulty, recognized the authority of the supreme lodge as now claimed and sought to be enforced against·it. If, then, their assent to such authority could confer it or estop them now from denying it the relief claimed in this proceeding should be denied, but it seems to me that such a position is not maintainable." He then cites *Lamphere* v. *Grand Lodge, supra.*

In the same line is *State, ex rel. Graham et al.,* v. *Miller et al., 66 Iowa 26.* The avowed and actual purposes of the Ancient Order of United Workmen were inquired into and considered and said order held to be an insurance company within the meaning of the code, and inasmuch as the supreme lodge of said order is a corporation of the State of Kentucky, and has not a guaranteed capital of $100,000 in that state, as required by the code, it was held that it was not authorized to transact business in Iowa, and that its mandate to the grand lodge of Iowa to raise a fund to relieve overburdened jurisdictions in other states was not binding on the grand lodge of Iowa, and where, upon the refusal·of the grand lodge to raise such funds, the supreme lodge declared its charter suspended and a provisional grand

lodge was organized under the authority of the supreme lodge, it was held that such action of the supreme lodge did not divest the original grant to the grand lodge of its rights, privileges and franchises and vest them in the provisional lodge. The applicability of the principles here acted upon to the case in hand is sufficiently manifest.

Several other cases were cited which, considering the great length to which this opinion has already extended, I deem it best not to notice, but will content myself with a recapitulation of my views in a condensed form.

The complainant was organized as a complete social entity, quite capable of prolonged existence as the representative of its local constituent units, without the aid of the national council. It had distinct objects and purposes.

. Its joining in the creation of the national council and coming under its jurisdiction did not alter its essence or render it incapable of existence separate from the national council, with full capacity to exercise all the functions which it had exercised when under such jurisdiction.

The grant to the complainant of a special charter by the legislature approved and made permanent its objects and gave it by implication an exclusive right to the use of its name in this state as well as the exclusive right to grant charters to local councils.

The attempt of the defendant, by unlawful means, to add to the original objects of the institution justified the complainant, if any justification is necessary, in severing its connection with the defendant.

Such severance did not alter the inherent character of complainant's existence or prevent it from altering the details of its constitution to suit it to an independent existence.

It now, by its constituent members, represents the overwhelming majority of the local councils in this state, and their constituent members amount in number to many thousands, and so long as it so represents them it is entitled to the exclusive use of its name and the exclusive right to grant charters to local councils and to be treated as the head of the order in this state.

I will advise a decree in accordance with these views.